# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

WILLIAM JOSEPH CANNON,
Defendant and Appellant.

S277995

First Appellate District, Division Five
A163083

Mendocino County Superior Court
SCUK-CRCR-2010-14869-2

---

August 18, 2025

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Kruger, Groban, and Jenkins concurred.

Justice Liu filed a dissenting opinion.

Justice Evans filed a dissenting opinion.

---

PEOPLE v. CANNON

S277995


Opinion of the Court by Corrigan, J.


In the context of civil commitment proceedings, a defendant's fundamental liberty interests are protected by the constitutional guarantees of due process and equal protection. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7; see also *In re Gary W.* (1971) 5 Cal. 3d 296 (*Gary W.*).) It is undisputed here that defendant William Cannon has a constitutional and statutory right to demand a jury trial on a petition to commit him under the Sexually Violent Predator Act. (SVPA or the Act; Welf. & Inst Code, § 6600 et seq.)[1] Cannon has argued for the first time on appeal that the Act denies him equal protection because it provides jury demand and waiver procedures that differ from the procedures provided in other commitment schemes.

The SVPA authorizes the involuntary civil commitment of convicted sex offenders after they have served their prison sentences if they are found beyond a reasonable doubt to be a "sexually violent predator" (SVP). An SVP candidate and the People both have the right to demand a jury trial on the

---

[1] All subsequent section references are to the Welfare and Institutions Code unless otherwise specified.

An SVP petition seeks commitment of a person designated as a "defendant." As we have in other cases, we sometimes refer to the person named in the petition as a defendant, a potential or alleged SVP, or an SVP candidate.

allegations. (§ 6603, subds. (a), (b).) Absent a demand, the trial is conducted "before the court without a jury." (*Id.*, subd. (f).) Near the end of Cannon's sentence for assault with intent to commit rape, the People petitioned to commit him under the SVPA. During two pretrial hearings, neither of which Cannon attended, his attorney waived his jury trial right. The trial court itself had not advised Cannon of his jury trial rights or sought his personal waiver, neither of which the Act requires. Following a bench trial, the court determined Cannon is an SVP and ordered him committed.

On appeal, Cannon asserted the SVPA commitment scheme violates his state and federal equal protection rights because it does not employ the same advisement and waiver procedures included in the commitment schemes for defendants who have pled not guilty by reason of insanity (NGI; Pen. Code, § 1026.5) or who are facing confinement under the offenders with mental health disorders (OMHD) law (Pen. Code, § 2960 et seq.).[2] We leave the ultimate adjudication of that claim to the trial court on remand. Here we hold, consistent with our decision in *People v. Barrett* (2012) 54 Cal. 4th 1081, 1107 (*Barrett*), that the proper standard of scrutiny for such an equal protection challenge is rational basis review. We affirm the Court of Appeal's order remanding this matter to the trial court to allow the parties to create a more complete record and to litigate the question in the trial court in the first instance.

---

[2] Before January 1, 2020, these latter defendants were described as mentally disordered offenders or MDO's. (See *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095, fn. 3 (*Eric B.*).)

## I.    BACKGROUND

In December 2010, Cannon pled no contest to assault with intent to commit rape (Pen. Code, § 220, subd. (a)) and dissuading a witness (*id.*, § 136.1, subd. (c)(1)).    Cannon admitted that in October 2010, while wearing a mask, he attacked a 16-year victim and tried to drag her off the street to rape her.  When she struggled, he threatened to kill her.  Two passersby came to her aid, and Cannon fled.  After his arrest, he confessed that he had also tried to break into his neighbor's house to rape her 15-year-old daughter and that he had been out "hunting females to sexually assault them."  Convicted, he was sentenced to a total term of seven years in prison.

In August 2016, the Mendocino County District Attorney filed an SVPA petition to commit Cannon after the completion of his term.  On October 3, 2016, the trial court found probable cause supported the petition and ordered Cannon to stand trial.  Cannon, who was present, waived his right to have a trial within 60 days.  His public defender, Linda Thompson, stated she would request Cannon be transferred to Coalinga State Hospital upon his prison release.  The court set a trial date of February 27, 2017, with a pretrial conference on December 5, 2016.  After conferring with Thompson, Cannon waived his presence at the pretrial conference.  There was no mention of Cannon's right to a jury trial.

At the December 5th conference, which Cannon did not attend, Thompson reported that the Board of Parole Hearings (BPH) had filed a concurrent MDO [now known as OMHD; see fn. 2, *ante*] petition.  As a result, the State Department of State Hospitals (SDSH) had moved Cannon to Atascadero State Hospital rather than Coalinga.  The court scheduled a new

pretrial conference so the parties could sort through the issue. Between that conference and May 22, 2017, the court vacated the original trial date and held five more pretrial conferences, none of which Cannon attended. During this time, Cannon remained housed at the Atascadero hospital. There were no discussions at any of these conferences of Cannon's right to a jury trial or whether he preferred to proceed with a bench or jury trial.

On May 12, 2017, again in Cannon's absence, Thompson relayed that the BPH rescinded the MDO petition and Cannon was to be transferred to Coalinga State Hospital. Cannon did not attend the next hearing on May 22, 2017, but Thompson appeared on his behalf and noted he had been moved to Coalinga. The court clerk announced that a "jury trial" was set for October 16, 2017. Between July 7 and October 6, 2017, the court held four more pretrial conferences in Cannon's absence. Throughout this period, it is evident the parties planned for a jury trial. At the August 4, 2017, conference, Thompson stated, "I'm going to confirm the jury trial for the October date." She also indicated that she was not "going to transport [Cannon] until he needs to show for trial." The court then asked, "Waive his appearance for the pretrial?" Thompson responded, "Yes." The court eventually set a new trial date for January 8, 2018. Thompson noted that jury selection would begin on that date and experts would be available to testify two days later.

On December 6, 2017, at Thompson's request, the court continued the trial date to April 9, 2018. On February 7, 2018, in Cannon's absence, the trial court asked Thompson whether she was waiving a jury trial on behalf of her client. She responded, "Yes." Again, on March 22, 2018, Thompson told the court that Cannon was not present "by choice" and reported, "We

did confirm it is a court trial, not a jury trial. My client is kind of wavering if he even wants to come at this point." On March 28, 2018, the defense requested a new trial date, which was set for October 1, 2018. Thompson again confirmed the date was for "a court trial."[3]

On July 17, 2018, public defender Eric Rennert took over Cannon's defense following Thompson's retirement. Rennert said he had not yet met with Cannon but had conferred with Thompson. He could not recall whether or not there had been a waiver of a jury trial and did not see a file notation to that effect. A different judge, who was presiding at the hearing, replied, "I don't believe there has been. And I think the best practice is to do that in person. I know your office has been getting them in writing." At an August 22, 2018, conference, Rennert reported that he had spoken with Cannon but did not indicate whether they had discussed the jury trial right, or whether Cannon had chosen to waive it. However, at one point, the court asked, "[W]e are still pending the trial which is now a court trial; is that right?" The prosecutor responded, "That's my understanding, your Honor from speaking with counsel who handled the case previously." The court set a new date of February 26, 2019, for a two-day court trial. At no time did Rennert indicate his client

---

[3] Review of the pertinent clerk's minutes in the record reveals the following. The minutes dated February 7, 2018, note: "JT prev. waived. PD and DDA waive JT for the record." In several subsequent minutes, the clerk repeatedly noted that the matter was designated as a court trial. Additionally, the removal orders for Cannon's return to Mendocino County for trial dated March 9, 2020, June 23, 2020, and September 22, 2020 all confirm Cannon was to be transported in for a "Court Trial."

wished to proceed with a jury trial. No other hearing occurred in 2018.

Over the course of 2019 into early January 2020, the court held nine more hearings, none of which Cannon attended. During these hearings, the court reset the trial date four more times. At nearly every hearing, the court and/or Rennert confirmed the defense had waived a jury and planned to proceed with a bench trial. On March 17, 2020, early in the COVID pandemic, Cannon appeared by video. The court began by telling him: "Today was the date set for a court trial on a petition that was filed by the district attorney that alleges that you fall within the SVP Act." However, based on the recent shelter-in-place orders, the court found good cause to continue the trial date so Cannon could be present in person. The court indicated the parties would meet three days later to pick a new trial date. It told Cannon, "You're not going to be present that date. Your attorney will appear for you and he will tell when you [sic] that date is and when you'll be brought back. Do you understand?" Cannon answered, "I do, your Honor." The court asked if Cannon had any other questions; he voiced none.

Between Cannon's appearance in March 2020 and the eventual bench trial, the court held eight more pretrial conferences, and the trial date was reset three more times. On October 5, 2020, Cannon was present, and the SVP trial began with the court stating, "So we're here for a court trial on the petition filed by the People . . . ." At no time did a judge directly advise Cannon of his right to demand a jury trial or elicit his personal waiver of that right. At no time did defendant or his counsel object to the procedure or request a jury trial. Following a four-day bench trial, the trial court found Cannon to be an SVP and ordered him committed for an indeterminate term. A more

complete account of the evidence presented at the trial can be found in the Court of Appeal opinion. (*People v. Cannon* (2022) 85 Cal.App.5th 786, 791–793 (*Cannon*).)

On appeal, Cannon argued for the first time that the trial court failed to directly advise him of his jury trial right or elicit his personal waiver, thus violating his federal and state constitutional rights to equal protection. He urged that alleged SVP's are similarly situated to OMHD's and NGI's, and that those commitment schemes require a judicial advisement and personal waiver while the SVPA does not. (Pen. Code, §§ 2966, subd. (a), 2972, subd. (b), 1026.5, subd. (b)(3), (4); see also *People v. Blackburn* (2015) 61 Cal.4th 1113, 1124–1125 (*Blackburn*); *People v. Tran* (2015) 61 Cal.4th 1160, 1167 (*Tran*).) He argued there was no constitutional justification for this differential treatment.

The Court of Appeal rejected the Attorney General's argument that Cannon had forfeited his equal protection claim by failing to raise the question in the trial court. It exercised its discretion to consider the pure question of law raised by his constitutional challenge. (*Cannon, supra,* 85 Cal.App.5th at pp. 794–795.) The People conceded SVP's are similarly situated to OMHD's and NGI's for the purposes of comparing the advisement and waiver procedures at issue. They disagreed, however, with Cannon's assertion that strict scrutiny review was called for to evaluate the state's proffered justifications made in its briefing before the Court of Appeal. Relying on *Barrett, supra,* 54 Cal.4th 1081, the court agreed with the People that rational basis review was the appropriate standard. (*Cannon,* at pp. 797–798.)

The court concluded the two rationales offered in the People's briefing failed to provide a rational basis for the differential treatment, but nevertheless, the court agreed with Cannon's counsel that remand was necessary. (*Cannon, supra,* 85 Cal.App.5th at pp. 799–800.) It ruled that remand was appropriate because Cannon's delay in raising his equal protection argument below denied the People a "meaningful opportunity to demonstrate a valid constitutional justification for the SVP's differential legislative treatment." (*Id.* at p. 800.) The court noted that a more inclusive record might be made to justify the different procedures available in SVP cases on the one hand, and NGI and OMHD petitions on the other. (*Ibid.*) The People resisted remand arguing that, even if the trial court was obligated under equal protection principles to advise Cannon of his jury trial rights and obtain his personal waiver, any error in failing to do so was harmless. (*Id.* at pp. 800–801.) Relying in part on *Blackburn,* the court held it could not find harmless error. It presumed counsel reasonably believed Cannon wished to waive a jury trial. (*Id.* at p. 795.) However, the record before it was insufficient to show that Cannon had been adequately advised by counsel of his jury rights or had "knowingly and intelligently" acceded to their waiver. (*Id.* at p. 801.) A remand would also give both parties an opportunity to create a more complete record on this question.

We granted review to address the narrow question of whether a strict scrutiny or rational basis standard applies to Cannon's equal protection challenge.[4]

---

[4] This court has subsequently granted review and is holding three more cases addressing the same issue. (*People v. Morrison*

## II.    DISCUSSION

*A.    Jury Trial Rights in Civil Commitment Proceedings.*

We first consider the constitutional source of the jury trial right in the case of a civil commitment.  The right to a trial by jury and the way the right may be waived have been enshrined in the California Constitution since the state's founding.  Article I, section 16 of the California Constitution declares:  "Trial by jury is an inviolate right and shall be secured to all . . . A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel.  In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute."  Thus, while the constitution specifically speaks to criminal jury waivers, it empowers the Legislature to address the requirements for civil jury waivers by statute.

As we have noted:  "From the outset of our state's history, our courts have explained that [Article I, section 16] was intended *to preserve* the right to a civil jury as it existed at common law in 1850 when the jury trial provision was first incorporated into the California Constitution."  (*Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 315.)  Additionally, we long ago recognized that "the rules under which the parties to a [civil] lawsuit may waive a jury trial must be prescribed by the Legislature, which is without power to delegate to the courts the responsibility of determining

_____

(2025) 110 Cal.App.5th 702, review granted June 25, 2025, S291041; *People v. Washington* (Mar. 19, 2025, B327869) [nonpub. opn.], review granted June 18, 2025, S290585; *People v. Magana* (Mar. 19, 2025, B327869) [nonpub. opn], review granted June 18, 2025, S290583.)

the circumstances under which such a waiver may be permitted." (*Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 952, citing *Exline v. Smith* (1855) 5 Cal. 112, 112–113; *Biggs v. Lloyd* (1886) 70 Cal. 447, 448–449.) Code of Civil Procedure section 631 embodies the exclusive legislatively selected means by which the constitutional right to a civil jury may be waived in California.[5] (*Parker v. James Granger, Inc.* (1935) 4 Cal.2d 668, 679.)

Several points bear emphasis. As both this court and the United States Supreme Court have repeatedly observed, the adjudication of a civil commitment petition is not a criminal proceeding. (*Moore v. Superior Court* (2010) 50 Cal.4th 802, 818; *People v. Allen* (2008) 44 Cal.4th 843, 860.) Nevertheless, our courts have recognized that, as a matter of procedural due process, several protections afforded criminal defendants must be extended to those facing possible civil commitment.[6] But

---

[5] By statute, the constitutional right to a civil jury may be waived in one of six ways: "(1) By failing to appear at the trial. [¶] (2) By written consent filed with the clerk or judge. [¶] (3) *By oral consent, in open court, entered in the minutes.* [¶] (4) By failing to announce that a jury is required, at the time the cause is first set for trial, if it is set upon notice or stipulation, or within five days after notice of setting if it is set without notice or stipulation. [¶] (5) By failing to timely pay the fee described in subdivision (b), unless another party on the same side of the case has paid the fee. [¶] (6) By failing to deposit with the clerk or judge, at the beginning of the second and each succeeding day's session, the sum provided in subdivision (c)." (Code Civ. Proc., § 631, subd. (f).)

[6] See, e.g., *Camacho v. Superior Court* (2023) 15 Cal.5th 354, 379 (SVP, speedy trial); *People v. Allen, supra,* 44 Cal.4th at p. 870 (SVP right to testify over the objection of counsel);

while those procedural protections include the right to a civil jury on demand (see *post*), the full panoply of rights applicable in criminal matters does not apply in civil commitment cases.[7] (*Allen v. Illinois* (1986) 478 U.S. 364, 372; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1170–1179; *Conservatorship of John L.* (2010) 48 Cal.4th 131, 151 (*John L.*).) The legislative provision of "procedural protections similar to those afforded criminal defendants 'does not transform a civil commitment proceeding into a criminal prosecution.' " (*People v. Allen*, *supra*, 44 Cal.4th at p. 861, quoting *Kansas v. Hendricks, supra,* 521 U.S. at pp. 364–365; see also *Hubbart,* at p. 1174, fn. 33.)

Further, this court has long described civil commitment adjudications as being "in the nature of special civil proceedings [that were] unknown to the common law . . . ." (*In re De La O* (1963) 59 Cal.2d 128, 150; see also *In re Liggett* (1921) 187 Cal. 428, 430; *Matter of Application of O'Connor* (1915) 29 Cal.App. 225, 235–236.) Beginning in the early twentieth century, the Legislature began to provide involuntary civil commitments for those who, for a variety of reasons, posed a danger to their own safety or that of others. The Lanterman-Petris-Short (LPS) Act

---

*People v. Burnick* (1975) 14 Cal.3d 306, 322–323 (proof beyond a reasonable doubt in NGI proceeding); *People v. Feagley* (1975) 14 Cal.3d 338, 375–376 (unanimous jury in mentally disordered sex offender (MDSO) proceedings).

[7]    See, e.g., *People v. McKee* (2010) 47 Cal.4th 1172, 1193–1195 (*McKee*) (SVP commitment statute does not violate ex post facto clause); *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 539 (due process does not require independent appellate review of whether there is any arguable issue on appeal); *Kansas v. Hendricks* (1997) 521 U.S. 346, 369 (initiation of civil commitment proceeding "does not constitute a second prosecution" for double jeopardy purposes).

(§ 5000 et seq.) of 1967 launched a series of enactments to provide more detailed administrative and judicial commitment procedures.[8] Because these commitments place a substantial burden on the freedom of those committed, the circumstances permitting such treatment are subject to both legislative determinations and judicial review. Lower courts, applying our own precedents, have repeatedly held that the jury trial provisions of article I, section 16 of the California Constitution do not apply to these special civil cases. (See, e.g., *People v. Rowell* (2005) 133 Cal.App.4th 447, 451–452 [SVPA proceedings]; *People v. Berry* (1968) 257 Cal.App.2d 731, 736 [former § 6312.2, MDSO proceedings]; *Smith v. Superior Court* (1965) 234 Cal.App.2d 1, 5–6 [former § 6735 for commitment, mentally ill and dangerous individuals]; *People v. Fuller* (1964) 226 Cal.App.2d 331, 335 [former § 5504, sexual psychopathic offenders].)

That is not to say, however, that a person facing civil commitment is bereft of constitutional protection. Instead, those protections are provided under a different constitutional rubric. Any civil commitment "constitutes a significant deprivation of liberty" and "can engender adverse social consequences to the individual." (*Addington v. Texas* (1979) 441 U.S. 418, 425–426.) As a result, we have recognized that a jury trial must be made available to civil commitment candidates as a matter of procedural due process when the statutory scheme fails to provide one. (See, e.g., *Gary W.*, *supra*, 5 Cal.3d at pp.

---

[8] For a detailed history of involuntary hospitalization proceedings of mentally ill patients in California before enactment of the LPS Act, see Projects, *Civil Commitment of the Mentally Ill* (1967) 14 UCLA L.Rev. 822.

306–307.)  Further, as a matter of *equal protection*, the state cannot arbitrarily withhold jury trial availability from one group of defendants while statutorily granting it to another. (See, e.g., *Baxstrom v. Herold* (1966) 383 U.S. 107, 110 (*Baxstrom*); *Humphrey v. Cady* (1972) 405 U.S. 504, 509.)  Some statutory schemes vary in terms of procedure.  The difference in how a jury trial right is exercised by a SVP candidate is at issue here.  Under all three of the schemes Cannon asks to be compared, a jury trial is made available.  However, the particulars of how the right is invoked or waived are provided for differently.  It is the standard of review for that differential treatment that we consider.

Cannon does not allege that the SVPA's commitment scheme denies him the right to a civil jury, or that the on-demand requirement constitutes a violation of the state or federal *due process clause*.  Instead, he alleges that, as a matter of *equal protection*, the legislative requirement that courts advise alleged NGI's and OMHD's of their jury rights and obtain a personal waiver must be extended to an alleged SVP before proceeding with a bench trial.  At this stage, we are not being asked to decide the ultimate question of whether the differences in procedure can be constitutionally *justified*.  That issue will be reserved for the trial court to determine in the first instance, applying the level of scrutiny we clarify here.

B.    *Comparison of the Relevant Statutes for Equal Protection Purposes.*

Comparing the three commitment schemes, the Legislature has provided for a jury trial in two different ways. Under the NGI and OMHD statutes, a jury is available as a general matter, unless waived.  (Pen. Code, §§ 1026.5, subd. (b)(4), 2972, subd. (a)(2).)  The SVPA, by contrast, provides for a

jury trial when either an SVP candidate, or the People, requests one. (§ 6603, subd. (f).) Additionally, the statutes relating to NGI and OMHD defendants call for the court to advise them of their right to a jury trial and secure a personal waiver of that right before proceeding by bench trial. (Pen. Code, §§ 1026.5, subd. (b)(3), 2972, subd. (a)(1).) The SVPA, however, does not contain those requirements. If neither the alleged SVP, their counsel, nor the prosecutor demand a jury trial, the statute provides for a court trial, which includes all the attendant due process rights, including assistance of counsel, presentation of a defense, and proof beyond a reasonable doubt. (§§ 6603, subds. (a), (e), 6604.)[9]

The right to equal protection under both the federal and California Constitutions is intended to ensure that the "government does not treat a group of people unequally without some justification." (*People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).) "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." (*Baxstrom*, *supra*, 383 U.S. at p. 111.) "Unlike other provisions of the Constitution, the Equal Protection Clause confers no substantive rights and creates no substantive liberties. The function of the Equal Protection

---

[9] In *Feagley*, we held that an individual facing commitment under the MDSO law, a precursor to the SVPA, was constitutionally entitled to a unanimous jury verdict based on equal protection and due process principles. (*Feagley*, *supra*, 14 Cal.3d at pp. 350352.) The Legislature subsequently codified this constitutional protection into the MDSO law (see *People v. Henderson* (1981) 117 Cal.App.3d 740, 747), and it incorporated the same requirement into the SVPA when it enacted the law in 1995. (§ 6603, subd. (g); Stats.1995, ch. 763, § 3, p. 5925.)

Clause, rather, is simply to measure the validity of classifications created by state laws." (*San Antonio School District v. Rodriguez* (1973) 411 U.S. 1, 59 (conc. opn. of Stewart, J.), fn. omitted (*San Antonio School District*).)

"The degree of justification required to satisfy equal protection depends on the type of unequal treatment at issue." (*People v. Hardin* (2024) 15 Cal.5th 834, 847 (*Hardin*).) Strict scrutiny is our most exacting level of constitutional review in which " ' "the *state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." ' " (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641.) In addition, any unequal treatment that is based on suspect classifications or that significantly burdens a fundamental right or interest is subject to strict scrutiny analysis. (*Eric B.*, *supra*, 12 Cal.5th at p. 1107.) If the statutory classification, however, does not differentiate based on a protected class or significantly burden a fundamental right or interest, the legislation is presumed valid unless the *challenger* can establish " 'there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.' " (*Hardin*, at p. 847, quoting *Chatman*, *supra*, 4 Cal.5th at pp. 288–289.)

"Although a fundamental interest may be involved, both the United States Supreme Court and this court have recognized that not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny standard. When the regulation merely has an incidental effect on exercise of protected rights, strict scrutiny is not applied. [Citations.] It is only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right that the strict scrutiny doctrine will be applied." (*Fair*

*Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 47; see also *Gould v. Grubb* (1975) 14 Cal.3d 661, 670 (*Gould*); *Butt v. State of California* (1992) 4 Cal.4th 668, 685–686.) Furthermore, within this specific context, we have emphasized that, despite the liberty interests involved, not " 'every detail of every civil commitment program is subject to strict scrutiny.' " (*McKee, supra*, 47 Cal.4th at p. 1210, fn. 13.)

*Hardin* explained that the burden of persuasion under a rational basis analysis is on the challenger: "The underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' [Citation.] Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review.' [Citation.] 'If a plausible basis exists for the disparity, courts may not second-guess its " 'wisdom, fairness, or logic.' " ' [Citation.] '[T]he logic behind a potential justification need [not] be persuasive or sensible — rather than simply rational.' " (*Hardin, supra*, 15 Cal.5th at p. 852; see also *People v. Williams* (2024) 17 Cal.5th 99, 124.)

Cannon advances two arguments in favor of strict scrutiny review. First, he contends heightened review is necessary because, in addition to the right to demand a jury trial as provided, he has a separate fundamental right to the judicial advisement and waiver procedures themselves. Alternatively, he contends that, even if these procedural rights themselves are not fundamental, the Legislature's on-demand procedure in the SVPA imposes a significant burden on his fundamental liberty interests. His argument outstrips the authority upon which he relies.

C.   *The Fundamental Interests at Issue.*

   1.   *The Fundamental Liberty Interest Mandates a Jury Trial Right.*

Defendant places great weight on *Gary W., supra*, 5 Cal.3d 296, but that case does not support the argument that he has a fundamental right to the particular procedures requiring advisement and personal waiver.   The statutory scheme reviewed in *Gary W.* provided that a person who had originally been sent to the California Youth Authority (CYA, or Youth Authority) as a minor could be civilly committed for treatment after reaching his mandatory CYA release date, upon a showing that he was a danger to the public safety due to a mental or physical disorder.   The statutory framework did not provide for a jury trial of any kind for these commitments, even though other commitment procedures did, including those available under the LPS and MDSO statutes, which provided for a jury trial on demand.   (*Gary W.*, at p. 303; see also former § 6318 [applicable to MDSO's]; §§ 5302–5303 [applicable to imminently dangerous persons under the LPS Act]; former §§ 3050, 3051, 3108 [applicable to narcotics addicts under the LPS Act].)

*Gary W.* acknowledged that "[c]ommitment proceedings are 'special proceedings of a civil nature.'" (*Gary W., supra*, 5 Cal.3d at p. 309.)   In considering the challenge that his commitment without a jury trial denied him due process and equal protection, the court explained:   "The commitment and detention for treatment of a physically dangerous Youth Authority ward does not of itself deny equal protection.   As appellant acknowledges, the Legislature has enacted a unified framework of laws providing for the involuntary commitment of persons who present a danger to society.   It is not unreasonable that the Legislature should devise several means by which to

17

detect and isolate persons who may present a danger to society." (*Gary W., supra*, 5 Cal.3d at p. 304.)

The court articulated the basis for selecting the strict scrutiny standard of review. "Although normally any rational connection between distinctions drawn by a statute and the legitimate purpose thereof will suffice to uphold the statute's constitutionality [citation], closer scrutiny is afforded a statute which affects fundamental interests or employs a suspect classification. [Citations.] In such cases the state bears the burden of establishing both that the state has a compelling interest which justifies the law and that the distinction is necessary to further that purpose. [Citations.]

"A variety of interests have been held to be so 'fundamental' as to impose this burden on the state. Voting [citation], procreation [citation], interstate travel [citation], and education [citation] have all been characterized as fundamental for this purpose. The right to a jury trial in an action which may lead to the involuntary confinement of the defendant, even if such confinement is for the purpose of treatment, is no less fundamental. Its fundamental nature is reflected by the absolute right to jury trial accorded by the Sixth [criminal cases] and Seventh Amendments [civil cases] to the United States Constitution and by article I, section 7 of the California Constitution in all criminal trials and in those civil actions in which such a right was available at common law.[10] Its fundamental nature was further emphasized by the United

---

[10] As previously indicated, the right to a jury, which was preserved under article I, section 7 of the California Constitution at the time of *Gary W.*, now appears under article 1, section 16 of the California Constitution.

States Supreme Court in *Duncan v. Louisiana* (1968) 391 U.S. 145, where the court held that due process requires that the right to jury trial be extended to defendants in state criminal prosecutions of a serious nature." (*Gary W., supra,* 5 Cal.3d at pp. 306–307.) In this regard, *Gary W.* went on to observe: "To the person who is threatened with involuntary confinement, these considerations are equally important whether the threat of confinement originates in a civil action or a criminal prosecution." (*Id.* at p. 307.)

*Gary W.* grounded its analysis in the fact that an involuntary commitment, whether as a result of civil or criminal adjudication, impinges on the committed person's liberty interest, citing the criminal case of *Duncan,* where the high court "found the right to jury trial was required by the dictate of the Fourteenth Amendment that no state 'deprive any person of life, liberty or property, without due process of law.' The court recognized that 'A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government' and that 'the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power — a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.' " (*Gary W., supra,* 5 Cal.3d at p. 307, quoting *Duncan v. Louisiana, supra,* 391 U.S. at pp. 155–156.) *Gary W.* concluded that in the case of involuntary commitment, it is the *liberty interest* that is fundamental, whether confinement is imposed in the criminal or civil context. (*Gary W.*, at p. 307.)

"In extending the right to trial by jury to other classes of persons subject to civil commitment proceedings, the California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in

criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction.  We conclude that in the absence of a compelling state purpose for the distinction between the class of persons subject to commitment pursuant to section 1800 and to other classes of persons subject to involuntary confinement, the right to jury trial is a requirement of both due process of law and equal protection of the law." (*Gary W., supra*, 5 Cal.3d at p. 307.)

The court held that Gary W. was entitled to a new commitment hearing because he was completely denied any opportunity to have a jury determine whether he posed a public danger.  It recognized that different commitment schemes may employ different procedures while explaining:  "The complexity of the various commitment statutes does not obscure the effect of denial of the right to jury trial.  We consider here a fundamental right, not minor procedural differences among the various commitment procedures." (*Gary W., supra*, 5 Cal.3d at p. 308.)  Significantly, it went on to hold that, like mentally disordered sex offenders, CYA wards who faced civil commitment having reached majority, were *entitled* to a jury trial *on demand* and a verdict reached by a three-fourths of jurors as is provided for a civil jury verdict.[11]  *Gary W.* held that due process and equal protection required the provision of a civil jury trial *when requested.*  It did not hold that a particular court

---

[11]    As noted in footnote 9, *ante*, this court subsequently held that, when tried by a jury, a civil commitment defendant is constitutionally entitled to a unanimous verdict before confinement.  The unanimous jury verdict requirement was subsequently incorporated into the SVPA.

advisement or personal waiver procedure was included in the fundamental liberty interest on which its holding was based.

The People agree that Cannon has a fundamental liberty interest in having his SVP commitment petition tried by a jury upon his request. They urge, however, that consistent with *Gary W.*, the SVPA complies with the California Constitution because it expressly provides the right to a jury, and it adequately protects the exercise and waiver of the right through the on-demand procedure and the statutory right to the assistance and advice of counsel. Relying in part on *Barrett*, the People further contend that Cannon has failed to establish a separate and additional fundamental right or interest in a particular express judicial advisement of the jury right or personal waiver procedure before a court may proceed with a bench trial. Cannon responds by claiming the statements in *Barrett* on the issue were dicta, the case is distinguishable, and our more recent decisions in *Blackburn* and *Tran* underscore the fundamental nature of jury advisement and waiver rights themselves in civil commitment proceedings.

Cannon's equal protection claim then turns on whether the differences between the "demand through counsel" procedure of the SVPA, as opposed to the court advisement and waiver procedure of the NGI and OHMD schemes, withstand scrutiny when reviewed under the appropriate standard.

2. *Cannon Fails To Establish That a Particular Jury Advisement and Personal Waiver Procedure Itself Constitutes a Separate and Distinct Fundamental Right or Interest.*

In the equal protection context, the United States Supreme Court has described a "fundamental" right or interest triggering strict scrutiny as one "explicitly or implicitly

21

guaranteed by the Constitution." (*San Antonio School District*, *supra*, 411 U.S. at p. 33.) We recognized in *Serrano v. Priest* (1976) 18 Cal.3d 728 (*Serrano II*), however, that our state equal protection clause is "possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable." (*Id.* at p. 764.) Thus, we will apply strict scrutiny to "legislative classifications which, *because of their impact on those individual rights and liberties* which lie at the core of our free and representative form of government, are properly considered 'fundamental.'" (*Id.* at pp. 767–768, & fn. 48, italics added.) It may be that under our state inquiry, considerations of substantive due process could also inform our determination of fundamental rights. In that context, both this court and the United States Supreme Court have employed a two-step methodology. (See *Washington v. Glucksberg* (1997) 521 U.S. 702, 720–721 (*Glucksberg*); *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 940 (*Dawn D.*); *In re Marriage Cases* (2008) 43 Cal.4th 757, 824.) "First, the court must make a ' "careful description" of the asserted fundamental liberty interest.' [Citation.] This 'careful description' is concrete and particularized, rather than abstract and general. . . ." (*Dawn D.*, at p. 940; *Glucksberg*, at p. 721.) "Second, the court must determine whether the asserted interest, as carefully described, is one of our fundamental rights and liberties; central to this determination is whether the asserted interest finds support in our history, our traditions, and the conscience of our people." (*Dawn D.,* at p. 940.)

In asserting the advisement and waiver procedures themselves constitute fundamental rights, Cannon describes an interest in "personally *deciding* whether to waive a jury trial."

We agree that SVPA commitment candidates have a right to personally decide whether to demand or waive jury. As we clarify, that decision is reserved to a commitment candidate so long as they are competent to make it, and counsel may not override this choice when made by a competent client. (See *post*, p. 37.) The crux of Cannon's argument, however, concerns the *method* by which SVP candidates are informed of their statutory jury right, the *manner* in which their decision is communicated to the court, and, in light of the candidate's decision, whether a court or jury trial is called for. Cannon fails to persuade that the particular procedure he identifies, while certainly efficacious, is rooted in either the state or federal Constitution, or otherwise fundamental under our precedents. However, before moving forward without a jury, the court must be able to conclude that a civil commitment candidate was aware of the right to demand a jury and made the decision to forego doing so. This judicial obligation supports the essential jury trial right. Yet, even in a criminal context, no state or federal court has ever held that a particular kind of judicial advisement is constitutionally mandated. (See, e.g., *People v. Sivongxxay* (2017) 3 Cal.5th 151, 168; *U.S. v. Cochran* (9th Cir. 1985) 770 F.2d 850, 851.) Before a criminal jury waiver may be accepted, the court must be satisfied that a defendant has been made aware of his or her right to a jury trial, which can be accomplished through judicial explanation or consultation with counsel. The court must also be satisfied that the defendant understands the right and personally announces in court a decision to waive it.

In the civil context, as we have noted, the state constitutional right to a jury may be waived either expressly, impliedly based on conduct, or by "failing to announce that a

jury is required . . . ." (Code Civ. Proc., § 631, subd. (f)(4).) Furthermore, the client's choice to demand or waive a jury in all matters has long been expected to be made *in consultation* with legal counsel, and particularly in civil matters, the decision is traditionally communicated to the court *through the attorney*.

To be clear, barring issues related to a client's mental competency, we have never held that the attorney exercises absolute control over the jury right *decision* in either the civil or criminal context. As a general rule, "in both civil and criminal matters, a party's attorney has general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters." (*In re Horton* (1991) 54 Cal.3d 82, 94.) "An attorney is not authorized, however, merely by virtue of his retention in litigation, to 'impair the client's substantial rights or the cause of action itself.'" (*Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 404, quoting *Linsk v. Linsk* (1969) 70 Cal.2d 272, 276.) Thus, in the criminal context, we have observed that "[i]t is for the defendant to decide such fundamental matters as . . . whether to waive the right to trial by jury . . . ." (*Horton*, at p. 95, citing *People v. Holmes* (1960) 54 Cal.2d 442, 443–444.)

Additionally, the Rules of Professional Conduct speak to the allocation of authority between attorneys and their clients. Rules of Professional Conduct, rule 1.2(a) states in part: "Except as otherwise provided by law in a criminal case, the lawyer shall abide by the *client's decision*, after *consultation with the lawyer*, . . . whether to waive jury trial . . . ." (Italics added.) A lawyer is also ethically obligated to: "reasonably* consult with the client about the means by which to accomplish the client's objectives in the representation"; "keep the client reasonably* informed about significant developments relating to the

representation"; and "shall explain a matter to the extent reasonably* necessary to permit the client to make informed decisions regarding the representation."[12] (Rules Prof. Conduct, rule 1.4(a)(2),(3), (b).) Of course, these ethical obligations apply when representing those facing civil commitment.

As discussed *post*, the SVPA honors this traditional allocation of responsibility between attorney and client by vesting in the SVP candidate the authority to decide whether to waive or demand a jury trial. But it does not follow from this conclusion that an attorney, who remains obligated to inform and confer with their client regarding the waiver decision, lacks the ability to properly advise them, or convey their waiver decision to the court. As we observed in *John L.*, *supra*, 48 Cal.4th 131, "in the absence of any contrary indication, the superior court may assume that an attorney is competent and fully communicates with the proposed [commitment candidate] about the entire proceeding." (*Id.* at p. 156.)

While jury advisement and personal waiver provisions similar to those incorporated in the NGI and OMHD statutes can be found in other civil commitment schemes, they have not been uniformly adopted across all of them. For instance, some statutory schemes require a court advisement but also require an actual defense request for a jury with the default proceeding being a bench trial absent such a demand. (See, e.g., §§ 5302, 5303 [jury right procedures under the LPS Act's 180-day postcertification commitments]; see also, § 5350; Prob. Code, § 1828 [the advisement and demand procedures for conservatorship proceedings for gravely ill individuals under

---

[12] Asterisks in the rules denote a term defined under rule 1.0.1 of the Rules of Professional Conduct.

the LPS Act].) As we observed in *Barrett*, "Of the nine commitment procedures [in California], a majority (including § 6500 et seq.) either do not reference jury trial matters at all (such that a right to jury trial on request has been constitutionally implied), or they say nothing about advisements or waivers of any jury trial right otherwise provided therein." (*Barrett*, *supra*, 54 Cal.4th at p. 1110, fns. omitted.)

This constitutional, legislative, and judicial context does not demonstrate that SVP candidates have a separate fundamental right or interest in the particular advisement and waiver procedure Cannon claims. The Legislature certainly may choose to implement it in the SVPA context. However, the equal protection question here is whether the on-demand procedure it selected significantly burdens an SVP defendant's fundamental liberty interests to such a degree that strict scrutiny is required. We now turn to the standard by which the current legislative scheme is reviewed. The holding in *Barrett* informs this consideration.

## D. *Our Case Law Supports Rational Basis Review*

Cannon contends *Barrett's* conclusion that rational basis review applies to a similar equal protection challenge was dictum because there we disposed of the constitutional claim on the threshold question of whether the two comparator groups were similarly situated for the purposes of the law.[13]

---

[13] After the court granted review and the parties filed briefs in this case, we decided *Hardin*, *supra*, 15 Cal.5th 834, in which we altered the traditional analytical framework for conducting rational basis review. In cases such as this one in which the statutes themselves draw distinctions between identifiable

Alternatively, he claims *Barrett* was wrongly decided. Defendant misreads *Barrett*. Having ruled that "persons like Barrett 'are entitled to jury trial upon request' " (*Barrett*, *supra*, 54 Cal.4th at p. 1097, quoting *O'Brien v. Superior Court* (1976) 61 Cal.App.3d 62, 69), we went on to specifically "assess the adequacy of this basic rule, and decide whether additional adjunct procedures [of judicial admonition and personal waiver] must be followed in open court for a valid nonjury trial to occur." (*Barrett*, at p. 1097.) The adjunct procedures *Barrett* considered are the same advisement and waiver procedures at issue here. The *Barrett* analysis is not dictum. While several aspects of that case, including the nature and degree of Barrett's disability, are distinguishable from the question as it is framed here, that precedent nevertheless supports the conclusion that the jury advisement and waiver procedures themselves do not constitute independent fundamental rights or interests and that the legislatively selected procedures in the SVPA, which make a jury trial available on demand, do not impose a significant burden on the fundamental liberty interest itself.

Barrett was a developmentally disabled adult who had lived in a private residence with assistance.[14] However, her increasingly violent behavior resulted in a civil commitment

groups, we no longer ask at the outset whether the groups are similarly situated for purposes of the law in question. (*Id.* at pp. 850–851.)

[14] Following *Barrett*, the Legislature replaced terms "mental retardation" and "mentally retarded" throughout the section 6500 statutory scheme with the terms "developmental disability" and "developmentally disabled." (Stats. 2012, ch. 25, § 19, eff. June 27, 2012.) When citing quoted material, the former set of terms is replaced with brackets providing the more current nomenclature.

petition alleging she was a danger to herself and others. (See § 6500 [pertaining to allegedly dangerous developmentally disabled persons].) The court ultimately set a date for a trial on the commitment petition. There was no record of any advisement as to a jury trial or its waiver. At a trial, at which Barrett was present and assisted by counsel, the People called Barrett's psychologist who testified she had an IQ in the range of the 40s to 50s, "a level deemed 'moderate' in the sense that it was neither mild nor severe." (*Barrett*, *supra*, 54 Cal.4th at p. 1091.) Additionally, she had cognitive deficiencies associated with her developmental disability that caused her to have serious difficulty with behavior control and made her a danger to herself and others. (*Ibid.*) Over the course of several years, she had assaulted family and staff, damaged property, and injured herself. (*Id.* at pp. 1091–1092.)

Barrett was committed to a secure treatment facility for one year, with renewal commitments available. She appealed alleging a denial of due process and equal protection. It was undisputed that the relevant commitment procedures did not provide the right for a jury trial, and as a result, did not include any judicial admonition or personal waiver requirement. The parties agreed, however, "under long-standing equal protection principles" that, absent a waiver, she was entitled to a jury trial. (*Barrett*, *supra*, 54 Cal.4th at p. 1089.) As does Cannon here, Barrett asserted that "the trial court was constitutionally compelled to (1) expressly advise her that she could request a jury and (2) obtain her personal waiver of a jury, before holding a bench trial." (*Ibid.*) Addressing her claims, the court reasoned as follows: "California has no fewer than nine involuntary commitment procedures that may apply to persons who have various mental problems, and who pose a threat to their own

welfare or to the safety of others. Some of these laws, including section 6500 et seq., operate in a manner largely independent of the criminal justice system. (See §§ 4825 [developmentally disabled persons under the LDDSA], 5000 et seq. [mentally ill persons under the LPS Act].) Others apply depending on whether a criminal prosecution has occurred. (See § 3000 et seq. [narcotic addicts whether or not they have been convicted of crimes].) Certain accused criminals may receive a mental health commitment in lieu of conviction and punishment. (See Pen. Code, §§ 1026–1027 [defendants acquitted by reason of insanity], 1367 et seq. [defendants found mentally incompetent].) Also, dangerously disordered offenders may be held upon discharge by the juvenile authorities (see Welf. & Inst. Code, § 1800 et seq.), or after serving a prison term (see § 6600 et seq. [sexually violent predators]; Pen. Code, § 2960 et seq. [mentally disordered offenders])." (*Barrett, supra*, 54 Cal.4th at pp. 1093–1094.)

The court observed that no statute authorized a jury trial in a case like Barrett's. Nonetheless, "there is no dispute that someone facing commitment under section 6500 et seq. has the right to trial by jury on the allegations of the petition. Neither party rests this premise on any provision of the federal or state Constitution that directly or expressly grants the right to a jury in criminal or civil trials. Rather, they invoke a long and unbroken line of California appellate court cases holding or assuming — largely on the basis of federal and state equal protection principles affecting fundamental interests — that persons alleged to be [developmentally disabled] and dangerous cannot be denied a jury *altogether* where jury trials are granted by statute to persons alleged to be mentally impaired and

dangerous under comparable commitment laws." (*Barrett, supra,* 54 Cal.4th at pp. 1096–1097.)

Barrett argued that simply providing a jury trial by constitutional implication was insufficient and "to protect the interests at stake . . . the jury trial option needs its own supplemental layer of support. In other words, the decision whether to try the case to the court or to a jury belongs solely to the person facing commitment, and it must be made *personally*, not through counsel." (*Barrett*, *supra*, 54 Cal.4th at p. 1097.) She urged the lack of judicial advisement and personal waiver in her case constituted structural error and compelled reversal. (*Id*. at p. 1098.) The court rejected those arguments. It recognized that "civil commitment for any purpose can affect liberty and other vital interests. [Citations]. Hence, due process safeguards apply whether the proceeding concerns [developmentally disabled] and dangerous persons [citation] or persons suffering from other dangerous disorders needing care and treatment." (*Ibid*.)

The court went on to state: "Notably, the procedural safeguards required in this context are flexible [citation], and the quantum and quality of the process due depend upon the nature and purpose of the challenged commitment. [Citation.] In making this determination, the courts weigh, assess, and consider various factors affected by the disputed procedure. Distilled, these considerations involve (1) the various private interests at stake, (2) any competing state or public concerns, and (3) the potential risk of an erroneous or unreliable outcome." (*Barrett*, *supra*, 54 Cal.4th at p. 1099.) The court agreed with Barrett that the due process interests involved "have been deemed sufficiently fundamental to implicate certain constitutional jury trial concerns in commitment cases, at least

in those relatively few instances in which a right to trial by jury has not been legislatively prescribed. It does not follow, however, that the jury trial option implied by the courts . . . is illusory unless accompanied by the ancillary procedures Barrett seeks. Nor do such procedures necessarily amount to independent constitutional rights applicable in every case. Instead, their due process availability depends, in a particular instance, on a careful balancing of the public and private interests described above." (*Id.* at p. 1100.)

The court separately considered her equal protection claim. Barrett argued that section 6500 candidates were entitled to the same court advisement of jury trial availability on demand called for under the LPS Act. (See § 5300, subds. (a)–(c); *Barrett, supra,* 54 Cal.4th at pp. 1106–1107.) Predating *Hardin* (see fn. 13, *ante*), the *Barrett* court presumed candidates for commitment under the two schemes were similarly situated for purposes of the jury trial right, but not for the "ancillary purpose" of express advisement and personal waiver. (*Barrett,* at p. 1108.)

The court compared the two schemes and observed the critical differentiating factor was the nature of the mental condition covered by each. The scheme at issue in *Barrett* involved dangerous developmentally disabled persons who are presumed to lack the ability to understand and evaluate their situation. The LPS scheme addressed those who, as a result of a mental illness or disorder, are dangerous to themselves or others. Among other differences, under the LPS Act, a "mental illness" may affect " ' " 'only limited areas of functioning, leaving other areas unimpaired, and consequently . . . *many mentally ill persons retain the capacity to function in a competent manner.'* " ' " (*Barrett, supra,* 54 Cal.4th at p. 1109, quoting *In*

*re Qawi* (2004) 32 Cal.4th 1, 17.) This reality suggests that mental conditions that may give rise to a 180-day LPS commitment "do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings."[15] (*Barrett*, at p. 1109.)

Applying rational basis review, the court rejected Barrett's assertion that the Legislature arbitrarily decided developmentally disabled persons were unsuited for the procedural protections at issue and unfairly subjected them to a more burdensome set of procedures. It explained: "[A]n equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. [Citation.] Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' [Citation.] Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination." (*Barrett, supra*, 54 Cal.4th at p. 1110.)

*Barrett* rejected the contrary views of two concurring and dissenting justices that a heightened form of review was necessary to evaluate classifications based on a person's

---

[15] The record below in this matter did not touch in depth on the effect of Cannon's condition on his overall intellectual functioning beyond the mental condition impacting his sexual aggression. It does reflect that he was convicted of a criminal offense and neither the court nor counsel in the criminal cases raised a question about his competence to stand trial or to form the mens rea required for a conviction. The remand order here permits the parties to delve further into this question and consider, if necessary, Cannon's ability to make informed decisions about the proceedings.

developmental disability. (*Id.* at p. 1144 (conc. & dis. opn. of Liu, J.); see also *id.* at p. 1113 (conc. & dis. opn. of Werdegar, J.).) Cannon urges *Barrett*'s statements about rational basis review were dicta because we disposed of the equal protection claim at the "similarly situated" threshold. He misses the mark. *Barrett* concluded the two groups were not similarly situated for purposes of the advisement and waiver procedures because of their different intellectual circumstances. As a result, in the majority's view, that difference provided the rational basis for differential treatment. As *Hardin* later clarified: "[I]n cases involving challenges to statutes . . . that facially distinguish between identifiable groups or classes of individuals, '[t]o ask whether two groups are similarly situated in this context' . . . is essentially 'the same as asking whether the distinction between them can be justified under the appropriate test of equal protection.' " (*Hardin, supra*, 15 Cal.5th at p. 849, quoting *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 798, fn. 19 (plur. opn.).) The *Barrett* majority did not view defendant's constitutional claims as involving fundamental rights, unduly burdening fundamental interests, or implicating protected classifications. It compared the fundamental liberty interests involving the right to a jury with the secondary procedural steps sought by Barrett. The decision supports the conclusion that rational basis review applies to Cannon's challenge. Cannon argues, however, that the later cases of *Blackburn* and *Tran* can be read to support a contrary conclusion. He reads those cases too broadly

*Blackburn* and *Tran*, both of which discussed *Barrett*, are not to the contrary. Those cases involved the specific

requirements of the NGI and OMHD statutes as written.[16] Indeed, in *Blackburn,* we explicitly *declined* to address whether mentally disordered offenders have a constitutional right, at all, to a jury trial in commitment extension proceedings. (*Blackburn, supra*, 61 Cal.4th at p. 1120.) Instead, we considered the particular statutory language incorporating the admonition and waiver requirements into the NGI and OMHD laws and what it revealed about the Legislature's intent in passing them. As noted, the question in this case turns on whether the SVPA, which does not include the language at issue in *Blackburn* and *Tran*, violates equal protection as a result of the omission. Neither *Blackburn* nor *Tran* considered that issue. Their holdings were based on the trial court's failure to honor the statutes as they had been enacted. The SVPA and its different procedural approach were not before the court in *Blackburn* or *Tran*, nor did those cases involve an equal protection claim based on a comparison among them. That is the very issue which will now be before the court on remand. The discussions in *Blackburn* and *Tran*, which address the purpose of the advisement and waiver procedures, may well inform that consideration, but they do not resolve it.

*Blackburn* and *Tran* held that, under both the NGI and OMHD schemes, the Legislature intended the decision to waive a jury trial rests solely with a competent defendant, not their attorney. (*Blackburn, supra*, 61 Cal.4th at p. 1125; *Tran, supra*, 61 Cal.4th at p. 1166.) Additionally, those cases interpreted the statutory jury advisement provisions to mean the Legislature intended trial courts to directly advise the defendant of their

---

[16] When *Blackburn* was decided, alleged OMHD's were still referred to as mentally disordered offenders or MDO's.

right to a jury trial even when they are represented by counsel. (*Blackburn*, at p. 1123; *Tran*, at p. 1166.) In both cases, the defendants' attorneys requested a bench trial. (*Blackburn*, at p. 1117; *Tran*, at p. 1164.) Neither record indicated whether the trial court directly advised the defendant of the jury trial right. (*Blackburn*, at p. 1116; *Tran*, at p. 1168.) Nor did either trial court obtain the defendant's personal waiver or find that he lacked the capacity to make a knowing and voluntary waiver. (*Blackburn*, at p. 1130; *Tran*, at p. 1168.) Thus, we concluded both trial courts violated *the statute* by accepting defense counsel's waiver of a jury for their client. (*Blackburn*, at p. 1130; *Tran*, at p. 1168.)

Turning to potential remedies, *Blackburn* and *Tran* held that when the trial courts fail to follow the explicit statutory requirements, the reviewing court should *treat* that failure "as tantamount to the denial of a jury trial" right (*Blackburn*, *supra*, 61 Cal.4th at p. 1134) and deem it reversible under California Constitution, article VI, section 13, *unless*: (1) the totality of circumstances in the record affirmatively shows the defendant's personal waiver was knowing and voluntary despite the court's failure to provide a statutorily required advisement, or (2) there was substantial evidence the defendant lacked the capacity to make a knowing and voluntary waiver at the time the court accepted defense counsel's waiver. (*Blackburn*, at p. 1136; *Tran*, *supra*, 61 Cal.4th at p. 1170.) "In both scenarios, the requirement of an *affirmative* showing means that no valid waiver may be presumed from a silent record." (*Blackburn*, at p. 1136; *Tran*, at p. 1170.) Under the latter two sets of circumstances, the court's failure to comply with the statutorily required jury advisement and waiver is subject to harmless

35

error analysis under article VI, section 13 of the California Constitution. (*Blackburn*, at p. 1136; *Tran*, at p. 1170.)

Cannon broadly argues that this remedy portion of *Blackburn* demonstrates that jury advisement and personal waiver procedures themselves are independent fundamental rights because failure to provide them is "tantamount to the denial of a jury trial." (*Blackburn*, *supra*, 61 Cal.4th at p. 1134.) He again misreads the opinion. *Blackburn* determined it was impossible on a silent record to determine whether the outcome of the trial would have been different if the court had properly followed the appropriate statutory procedures. (*Ibid*.) But we recognized that in different circumstances — where the record shows the defendant lacked the capacity to make a proper waiver, or in fact made such a waiver even without the statutory advisement — the failure to follow statutory directives could be harmless. (*Id*. at p. 1136.) This recognition is consistent with our conclusion here that there is, in fact, a difference between the deprivation of an advisement and personal waiver, on the one hand, and the deprivation of jury trial, on the other; one is not tantamount to the other.

On this record, like the Court of Appeal, we cannot conclude the trial court violated Cannon's rights by accepting his counsel's representation of his client's jury waiver. As we previously observed here as well as in *Blackburn*, generally " ' "counsel is captain of the ship" ' " and has authority to bind the client in procedural aspects of litigation." (*Blackburn*, *supra*, 61 Cal.4th at p. 1120.) However, as noted, this captaincy generally does not extend to the decision to waive jury. Thus, given "the possibility of 'a significant deprivation of liberty' . . . we train our attention on the text and purpose of the particular statutes that govern this special proceeding to

determine whether the decision to waive a jury trial must be made by the defendant or may be made by counsel notwithstanding the defendant's wishes." (*Id.* at p. 1124.)

Despite its procedural differences with the NGI and OMHD statutes, the statutory text of the SVPA indicates the Legislature also intended an alleged SVP to maintain control over the jury trial decision itself, assuming they are mentally competent to do so. As in *Blackburn* and *Tran,* use of the term "person subject to this article" in section 6603 refers to the *defendant*, rather than his or her attorney. For instance, section 6603, subdivision (a) specifically indicates "[a] *person subject to this article* is entitled to a trial by jury . . . [and] the assistance of *counsel. . . .*" (italics added), and section 6603, subdivisions (d)(1) and (k)(1) refer specifically to "*the counsel* for the person subject to this article" (italics added). (See also § 6603.3 [drawing distinctions between the "person subject to this article" and their attorney].) Thus, based on the plain statutory language and consistent with our application of the NGI and OMHD statutes in *Tran* and *Blackburn*, we conclude the alleged SVP, rather than counsel, has final say over whether to demand a jury trial. The question remains as to *how* defendants are informed of their option and how that "final say" may be conveyed to the court.

Unlike in *Blackburn* and *Tran,* the Legislature has not directly spoken on that issue in the SVP context. There is no argument that the availability of a jury trial is an essential protection for the fundamental liberty interests at stake, and the decision is reserved to the defendant in the final analysis. We are also, of course, mindful that "[t]he purpose of an advisement is to inform the defendant of a particular right so that he or she can make an informed choice about whether to

waive that right." (*Blackburn, supra,* 61 Cal.4th at p. 1125.) The question here then is by what procedure do trial and appellate courts ensure that a commitment candidate made their own informed decision as to a jury trial.

Just as the statutory *inclusion* of jury advisement and personal waiver procedures was critical to our holdings in *Blackburn* and *Tran,* the noticeable absence of similar procedural components from the SVPA leads to a different conclusion:  the Legislature chose to protect an alleged SVP's right to make an informed choice of factfinder *through* the statutory right to and advice of counsel.  As we observed in *Barrett,* "Counsel is presumed competent and informed as to applicable constitutional and statutory law.  This presumption necessarily includes the defense right to seek a jury trial in a [civil commitment] proceeding, regardless of any court advisement." (*Barrett, supra,* 54 Cal.4th at p. 1105; see also *John L., supra,* 48 Cal.4th at pp. 156–157.)  Because the decision as to a jury trial is significant, the record must support a judicial conclusion, through the express representations of counsel or otherwise, that counsel has explained the jury trial right and obtained the client's permission to demand or waive a jury.

Cannon contends this court foreclosed such a conclusion when *Blackburn* dismissed the notion that it was sufficient to provide the advisement to counsel rather than the defendant under the OMHD statute. (*Blackburn, supra,* 61 Cal.4th at p. 1124.)  As we have pointed out, however, the Legislature chose a *different* set of procedures in the SVPA.  Whether this legislative decision can be constitutionally *justified* under the appropriate standard of review anticipates the next step in the equal protection analysis.  Our immediate task is to resolve the following claims:  (1) whether the right to a jury advisement and

personal waiver is, itself, a fundamental right, and (2) whether the SVPA's on-demand procedures constitute a significant burden on a defendant's fundamental liberty interests, triggering the most exacting form of scrutiny. We reject both assertions. It is important to emphasize, however, that designating these procedures as "ancillary" or "secondary" distinguishes between the fundamental right to demand a jury and the additional procedural framework bearing on that right. It should not be understood to undermine the important purposes that procedures like these serve when the Legislature adopts them. The question here is not whether they can be employed. Rather, it is whether they are constitutionally compelled.

To summarize: A comparison of the SVPA with the NGI and OMHD commitment schemes reveals that all three make a civil jury trial available to a commitment candidate, but they differ in the procedures for doing so. In the former, a jury trial is available on demand. The statute permits counsel to explain the right to the defendant and convey the client's choice of jury trial or waiver to the court. In the latter, before proceeding to a bench trial, the court must provide the admonition and obtain a waiver from the defendant. On remand, the court must determine whether the People put forward a justification for the Legislature's choice of differing procedures and whether the defense can establish that those proffered reasons fail to demonstrate a rational basis for the legislative choice. The court must also determine whether the facts presented demonstrate by a preponderance of the evidence that Cannon was aware of his right to demand a jury trial and chose to waive it. (See *Blackburn, supra,* 61 Cal.4th at p. 1137.)

Because Cannon did not raise his equal protection challenge in the trial court, the Court of Appeal ultimately ordered the case remanded "to give the People a meaningful opportunity to demonstrate a valid constitutional justification for the SVP's differential legislative treatment." (*Cannon, supra*, 85 Cal.App.5th at p. 800, citing *McKee, supra*, 47 Cal.4th at pp. 1208–1210.) Given that we granted review solely to resolve the governing level of scrutiny, and the parties likewise anticipate having an opportunity to litigate this issue more fully below, we affirm the Court of Appeal's order.

## E. *Response to the Dissent*

Our dissenting colleagues raise several points which we address in turn.

The dissent suggests that there is a difference of some kind between a fundamental "right" and a fundamental "interest." In this context, however, whatever distinction there may be makes no difference to the outcome; the dissent's suggestion to the contrary is unpersuasive and unsupported. The dissent asserts the "state's duty is conditional." (Dis. opn. of Liu, J., *post*, p. 5.) This is not quite right. A state's duty is not conditional. It is more precise to say that the state has a duty not to illegitimately place conditions on a fundamental right or interest. To make that assertion simply states the guarantee protected by the Equal Protection Clause. It does not define *what* a fundamental interest is or how it purportedly differs from a fundamental right. In this context, however, whatever distinction there may be makes no difference to the outcome. The dissent offers no definition or analysis in support of its conclusion that the procedures challenged here qualify as

either a fundamental right or a fundamental interest invoking strict scrutiny.

The dissent suggests that the distinction between "rights" and "interests" is meaningful because the latter encompasses broader circumstances. In the end, however, strict scrutiny is called for when a state-chosen difference in treatment violates or improperly burdens rights and interests recognized as fundamental, or when it discriminates based on membership in a protected class. Rational basis review applies if differential treatment does not impinge upon fundamental rights and interests or protected status but is allegedly irrational in the distinctions it makes. As a review of the authorities cited here shows, the terms "rights" and "interests" are often used interchangeably in the relevant case law and are often used in conjunction to ensure that protections are not interpreted too narrowly.

The discussion in *Gary W.*, *supra*, 5 Cal. 3d 296 is instructive. There, the court, in concluding that due process requires the "right" to a jury trial, spoke of "interests" that have been "held to be so 'fundamental' as to impose this [strict scrutiny] burden on the state." (*Id.* at p. 306.) It immediately supported this statement by pointing to the recognized fundamental "interests" in voting, procreation, and interstate travel, citing cases that repeatedly cast those interests as "rights." (See, e.g., *Castro v. State of California* (1970) 2 Cal.3d 223, 234 [fundamental "right of suffrage"]; *Skinner v. Oklahoma* (1942) 316 U.S. 535, 536, 541 [fundamental "right to have offspring"]; *Shapiro v. Thompson* (1969) 394 U.S. 618, 630 [fundamental "right to travel interstate"].) Urging that the "legal terminology" can be confusing, our dissenting colleagues put forward the notion that rights and interests are somehow

different. No authority is cited for this proposition. To the contrary, numerous cases, including a number of those quoted here, have repeatedly used them in conjunction when describing how to evaluate the manner in which statutes are to be interpreted.

In support of the proffered "distinction," the dissent points to examples that all involve rights and interests properly held to be so important as to be fundamental. A poll tax perniciously burdens the "right to vote" on an equal basis with other citizens, which is deemed "fundamental" because it is "preservative of other basic civil and political rights . . . ." (*Harper v. Virginia Bd. of Elections* (1966) 383 U.S. 663, 667.) Discriminatory schemes for funding public schools burden what we recognized as the "right to education" which we found to be "fundamental" based on the "indispensable role [it] plays in the modern society." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 605 (*Serrano I*).) In *Serrano I* and *Serrano II*, where we interpreted our constitutional protection to education more broadly than our federal counterparts (see *Serrano II*, *supra*, 18 Cal.3d at pp. 765–766), we also used the term "interest." This example proves the point. Whether described as a "right" or an "interest," this court has concluded that access to education is so important as to be fundamental.

The dissent would conclude that heightened scrutiny should apply here by focusing solely on Cannon's second argument regarding the burden the SVPA's jury procedures place on his ability to select a jury trial and ignoring his first argument that he has a separate fundamental right to the advisement and waiver procedures themselves. (Dis. opn. of Liu, J., *post*, p. 15.) We decline to do so. We address *Gary W.* in detail because Cannon relies on this precedent to argue that he

has a fundamental right to the procedures he seeks and that strict scrutiny applies *whenever* the availability of a jury in a civil commitment proceeding is implicated in any way. In order to address his arguments fully, we must first identify the *source* of that right on which he relies, which we have recognized protects the fundamental liberty interest.

Related to this point, the dissent takes issue with the reliance on due process principles in the fundamental interests analysis In particular, it questions mention of the two-step methodology under *Glucksberg*, *supra*, 521 U.S. 702 and *Dawn D.*, *supra*, 17 Cal.4th 932, to explore Cannon's claim that he has a fundamental right or interest in the judicial advisement and personal waiver procedures he seeks. (Dis. opn. of Liu, J., *post*, p. 10.) The dissent asserts *Glucksberg* and *Dawn D.* can play no part in assessing whether an interest is fundamental for equal protection purposes because those cases focused only on questions of substantive due process, not equal protection. Both logic and precedent undermine the assertion.

As we have discussed, the concepts of due process and equal protection are complementary and sometimes interrelated. The dissent's analysis would uncouple them. As noted, equal protection is not a source of substantive rights or liberties. Instead, it serves separately to ensure any differential legislative treatment is adequately justified under the appropriate level of scrutiny. We have explained that the right to demand a jury trial in civil commitments is based not on article 1, section 16 of the California Constitution, but on principles of procedural due process protecting the fundamental liberty interest. Equal protection is also implicated when the Legislature grants a jury right to one group of civil commitment candidates, but not to others. While Cannon does not claim a

*due process* right to the advisement and waiver procedures in the NGI and OMHD statutes, he does claim a *fundamental* interest in such procedures. If such a fundamental interest exists, it would flow from the fundamental liberty interest protected by procedural due process. It can find no independent purchase in equal protection, which confers no substantive rights of its own but stands as an independent safeguard against unjustified, unequal treatment. An equal protection challenge may lie even when the involved interest has not been recognized as fundamental. But it is the nature of the right or interest that is significant to selecting the *standard of review* applicable to such a challenge.

The dissent asserts that we have never held that a court must first conclude that a deprivation infringes on a fundamental right as a matter of due process before applying heightened scrutiny. (Dis. opn. of Liu, J., *post*, p. 9.) It cites to our decision in *McKee*, *supra*, 47 Cal.4th at p. 1207 for the undisputed principle that "[d]ue process and equal protection protect different constitutional interests: due process affords individuals a baseline of substantive and procedural rights, whereas equal protection safeguards against the arbitrary denial of benefits to a certain defined class of individuals, *even when the due process clause does not require that such benefits be offered.*" (Italics added.)

We agree that an interest does not need to derive from due process principles to rank as fundamental for equal protection purposes, but it must find its footing on some fundamental ground rather than simply asserting it is a right or benefit granted to some but not others. Thus, the two-step substantive due process analysis under *Glucksberg* and *Dawn D.* can inform whether an interest is fundamental for equal protection

purposes, given the provenance of the jury trial right at issue. *In re Marriage Cases, supra*, 43 Cal.4th at page 784, for example, considered substantive due process rights associated with marriage in the course of considering the level of scrutiny that applied to an equal protection challenge to laws that treated same-sex unions differently.

Here, Cannon argues that the particular advisement and waiver procedures he seeks sit at the core of the right to secure a jury trial, which we have recognized as being essential under due process analysis given the fundamental liberty interests at stake. Before we can determine whether the legislative choice to employ *different* jury trial procedures must be subject to strict scrutiny, we need to determine whether he holds a fundamental right or interest in the procedures he seeks. Cannon has the right to decide whether to demand a jury. (*Gary W., supra*, 5 Cal.3d at pp. 306–307.) As we have explained, however, that conclusion does not mean the procedures he seeks are fundamental or that they impinge upon or substantially burden the jury right or render it illusory, nor do they substantially burden the underlying liberty interests at stake.

The dissent also criticizes the majority's reliance on *Barrett*, claiming it "conducted no fundamental interest analysis at all," and confined its analysis to the "similarly situated" step. (Dis. opn. of Liu, J., *post*, p. 15.) It posits that we "simply do not know" if the court believed the classifications at issue were justified under strict scrutiny or rational basis. (*Id*. at p. 16.) The dissent ignores the fact that Barrett, like Cannon here, also claimed a separate fundamental right in the advisement and waiver procedures. Thus, as previously discussed, the *Barrett* court addressed that very question to determine whether she had a fundamental right or interest in these ancillary

45

procedures as part and parcel of the jury trial right. The court concluded that Barrett did not have such a right in the procedures at issue. (*Barrett*, *supra*, 54 Cal.4th at p. 1100.) That analysis certainly *did* inform the equal protection analysis that followed.

Additionally, it is not accurate to claim that the majority went no further than the "similarly situated" threshold step. The court also addressed "Barrett's equal protection claim . . . that . . . the Legislature has arbitrarily decided that alleged mentally retarded persons are unsuited to such protection, and has unfairly subjected them to more burdensome procedures than persons facing commitment in almost any other circumstance. In essence, Barrett simply implies that if some such schemes include these provisions, then all must." (*Barrett*, *supra*, 54 Cal.4th at p. 1009.) We stated, "an equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. [Citation.] Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' [Citation.]" (*Id.* at p. 1110.) These statements are all hallmarks of rational basis review. Finally and importantly, we know that the court viewed the justifications for the disparate treatment under rational basis review because it told us that it did so. "Justices Liu and Werdegar are aware that we have correctly applied the United States Supreme Court's prevailing 'rational basis' standard . . . ." (*Id.* at p. 1111, fn. 21.)

Lastly, the dissent claims the majority has suggested the holdings in *Blackburn* and *Tran* were a "function of the limitations of the records in those cases" and that such a suggestion is undermined by the fact that "Tran *might have known* he had a jury trial right given his experiences at three

prior hearings." (Dis opn. of J. Liu, *post*, p. 14, citing *Tran*, *supra*, 61 Cal.4th at pp. 1173–1174 (conc. & dis. opn. of Cantil-Sakauye, C. J.).) The holdings at issue related to the *available remedies* required because of the trial court's statutory violations. Those holdings certainly were predicated, in part, on the record limitations. The holdings regarding what was required of the trial court were a function of the statutory provisions themselves and what the Legislature had prescribed by including them. It is also not wholly accurate to say we applied the *Blackburn* holding in *Tran* in the face of evidence of a valid waiver. Instead, we declined to infer from the circumstances that Tran knowingly and voluntarily waived his right to a jury trial because, *based on the NGI statute*, the onus was on the *People* to prove consent to the bench trial, with the default proceeding being a jury trial absent such a showing, and the record was inconclusive on that point. (*Tran*, at p. 1169.)

### III.   DISPOSITION

We affirm the Court of Appeal's order remanding this matter to the trial court for further proceedings.  The order declaring defendant Cannon to be an SVP and committing him to the SDSH for an indeterminate term is conditionally affirmed pending the outcome of those proceedings.  If the reasons underlying differential statutory treatment are found insufficient under rational basis review, or if the court concludes the record presented is insufficient to show Cannon was aware of and agreed to his counsel's exercise of a jury waiver on his behalf, the order of commitment shall be set aside and the matter rescheduled for trial.

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. CANNON

S277995


Dissenting Opinion by Justice Liu


We granted review to decide what standard of review applies to defendant William Cannon's equal protection claim that alleged sexually violent predators (SVPs), no less than other persons subject to civil commitment, are entitled to personal advisement and waiver of the right to a jury trial in commitment proceedings. Today's opinion concludes that rational basis review is the appropriate standard because an alleged SVP has no "separate fundamental right or interest in the particular advisement and waiver procedure Cannon claims" (maj. opn., *ante*, at p. 26) and because "the legislatively selected procedures in the [Sexually Violent Predator Act], which make a jury trial available on demand, do not impose a significant burden on the fundamental liberty interest" that the right to a jury trial protects (*id.* at p. 27).

In focusing primarily on whether an alleged SVP has a "fundamental right" to personal advisement and waiver, the reasoning in today's opinion obscures the main issue in this case. Under the "fundamental interest" strand of equal protection analysis as developed by this court and the United States Supreme Court, the proper inquiry is whether the lack of a personal advisement and waiver requirement in the context of civil commitment appreciably burdens an alleged committee's exercise of the right to a jury trial. Our precedent makes clear the answer is yes. Accordingly, alleged committees have a fundamental interest in these procedures, and the selective

1

denial of these procedures to alleged SVPs is subject to heightened equal protection scrutiny, not rational basis review.

## I.

Under the commitment schemes for persons not guilty by reason of insanity and for offenders with mental health disorders, a valid jury trial waiver requires that the trial court advise the alleged committee of the right to a jury trial and obtain a personal waiver of that right from the alleged committee. (Pen. Code, §§ 1026.5, subd. (b)(3)–(4), 2972, subd. (a)(1)–(2).) Under the commitment scheme for SVPs, there are no such procedures for a jury trial waiver, and a jury trial is provided only upon an alleged SVP's request. (*Id.*, § 6603, subd. (f).) The question is what standard of equal protection review applies to this disparate treatment.

Because the object of disparate treatment in this case is a set of procedures (i.e., personal advisement and waiver of the jury trial right), much of today's opinion looks to *due process* principles to resolve the *equal protection* issue before us. (Maj. opn., *ante*, at pp. 9–13, 17–21.) The result of this analytical confusion is a lack of focus on the relevant inquiry for determining the proper standard of equal protection review. This case has to do with the "fundamental interest" strand of equal protection analysis, and I begin by describing how this strand differs from due process doctrine and other aspects of equal protection doctrine.

## A.

A useful starting point is to clarify what is meant by a claim that the state has violated an individual's "fundamental rights." As relevant here, a "fundamental right" typically belongs to one of two categories. The first are rights that appear

expressly in the text of the federal or state Constitution. For example, "the privilege against compelled self-incrimination has been viewed as 'fundamental.' [Citations.] . . . The right to compulsory process is a 'fundamental' right. [Citations.] Another 'fundamental' right is the right of confrontation." (*People v. Barnum* (2003) 29 Cal.4th 1210, 1222–1223.) These rights are expressly enumerated in the federal or state Constitution, or both. (See U.S. Const., 5th & 6th Amends.; Cal. Const., art. I, § 15.)

A second category consists of fundamental rights implied by the Fourteenth Amendment's provision that no state shall "deprive any person of life, liberty, or property, without due process of law." The high court has "long recognized that the . . . Due Process Clause . . . 'guarantees more than fair process.' [Citation.] The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " (*Troxel v. Granville* (2000) 530 U.S. 57, 65.) For example, "the 'liberty' protected by the Due Process Clause includes the rights of parents to 'establish a home and bring up children' and 'to control the education of their own.' " (*Ibid.*) The right to marry is also recognized as fundamental because of its connection to the liberty protected by the due process clause. (*Obergefell v. Hodges* (2015) 576 U.S. 644, 664 (*Obergefell*); *Loving v. Virginia* (1967) 388 U.S. 1, 12.)

Separate and apart from claims asserting fundamental rights, equal protection claims target state-enacted discrimination or disparate treatment. Although virtually all legislation involves classifications of some sort and legislators have wide latitude in policymaking, "both federal and California decisions make clear that heightened scrutiny applies to State-

maintained discrimination whenever the disfavored class is suspect *or* the disparate treatment has a real and appreciable impact on a fundamental right or interest." (*Butt v. State of California* (1992) 4 Cal.4th 668, 685–686 (*Butt*).)

The most familiar equal protection claims subject to heightened scrutiny are those challenging discrimination against a suspect class. The "traditional indicia of suspectness" include whether the group has been "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." (*San Antonio School District v. Rodriguez* (1973) 411 U.S. 1, 28 (*Rodriguez*); see *United States v. Carolene Products Co.* (1938) 304 U.S. 144, 152, fn. 4.) The paradigmatic example is discrimination against African Americans; such discrimination offends equal protection regardless of the importance of the good or service withheld. (See, e.g., *Holmes v. City of Atlanta* (1955) 350 U.S. 879 [invalidating exclusion of African Americans from public golf courses]; *Mayor and City Council of Baltimore City v. Dawson* (1955) 350 U.S. 877 [invalidating racial segregation of public recreational facilities].) As a matter of state equal protection doctrine, we have held that discrimination on the basis of sexual orientation is subject to strict scrutiny because gay people "historically ha[ve] been subjected to invidious and prejudicial treatment" and "the characteristic in question generally bears no relationship to the individual's ability to perform or contribute to society." (*In re Marriage Cases* (2008) 43 Cal.4th 757, 843.)

Another set of equal protection claims subject to heightened scrutiny are those challenging laws whose

"disparate treatment has a real and appreciable impact on a fundamental . . . interest." (*Butt, supra,* 4 Cal.4th at p. 686.) Because this legal terminology can be confusing, it is important to note the distinction between fundamental interests and fundamental rights: Fundamental rights are secured to every person, and the assertion of a violation does not depend on any comparative claim. Fundamental rights are freestanding in that the state may not deny such rights to anyone, whether or not it denies such rights to others. Fundamental interests are not freestanding in this sense; they are not independent rights or entitlements that the state has a duty to protect or provide for each person. Instead, the state's duty is conditional; if legislation protects or provides a fundamental interest for some people but not others, a heightened justification for the disparate treatment is required. And this is so whether or not the person asserting a fundamental interest belongs to a suspect class.

Today's opinion includes a slew of verbiage that muddles these doctrines (see maj. opn., *ante,* at p. 40 [declining to distinguish between fundamental rights and fundamental interests in this context]; *id.* at pp. 40–45 [contesting my description of the doctrines above]), though fortunately for our case law those assertions are dicta. (*Id.* at p. 40 ["In this context, . . . whatever distinction there may be makes no difference to the outcome . . . ."]; see *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158 [" 'Dicta consists of observations and statements unnecessary to the appellate court's resolution of the case.' "].) The fact is that the distinction I have drawn between "fundamental rights" and "fundamental interests" is a recitation of hornbook constitutional law. (See Brest et al., Processes of Constitutional Decisionmaking: Cases and Materials (6th ed.

2015) The Constitution in the Modern Welfare State, ch. 10, p. 1802 ["[A]lthough the state does not have to extend the right to vote generally, once it does so it may not invidiously discriminate in how it provides the right. We might call such a guarantee a 'fundamental interest' as opposed to a 'fundamental right' like speech or the right to travel that the state must guarantee to all of its citizens."]; Stone et al., Constitutional Law (8th ed. 2018) Fundamental Interests and the Equal Protection Clause, ch. 6, § E, pp. 824–825 [summarizing the "fundamental interests" strand of equal protection cases: "Sometimes the Constitution recognizes that the state need not provide certain things, but it constrains the distribution of those things once the state has provided them."]; Feldman & Sullivan, Constitutional Law (21st ed. 2022) The "Fundamental Interests" Branch of Equal Protection, § 5, p. 836 ["Such [fundamental] interests that are capable of escalating review are not rooted in any independent source of protection elsewhere in the Constitution; if they were, there would be no need for litigants to resort to equal protection in order to protect them indirectly."].)

An example of the fundamental interest strand of equal protection analysis is the high court's treatment of voting in state elections. "While the right to vote in federal elections is conferred by Art. I, § 2, of the [federal] Constitution [citation], the right to vote in state elections is nowhere expressly mentioned." (*Harper v. Virginia Bd. of Elections* (1966) 383 U.S. 663, 665.) Yet "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." (*Ibid.*) Because voting " 'is preservative of other basic civil and political rights' " (*id.* at p. 667), it "is too precious, too fundamental to be . . . burdened or conditioned" by a poll tax (*id.* at p. 670)

regardless of whether there is a freestanding right to vote in state elections.

Another example is education. While the United States Supreme Court has declined to recognize a fundamental right to education (*Rodriguez, supra,* 411 U.S. at p. 35), this court has nonetheless applied heightened scrutiny to equal protection challenges to public school financing schemes or other school policies on the ground that education is a " 'fundamental interest.' " (*Serrano v. Priest* (1971) 5 Cal.3d 584, 609 (*Serrano I*); see *Serrano v. Priest* (1976) 18 Cal.3d 728, 767–768 (*Serrano II*) [affirming post-*Rodriguez* that education is a fundamental interest under state equal protection doctrine]; *Butt, supra,* 4 Cal.4th at p. 686 [same].) Our heightened equal protection scrutiny in those cases did not depend on whether the claimant was a member of a suspect class or whether the federal or state Constitution expressly or implicitly established a freestanding right to education.

Some cases have held that a particular law infringes on a fundamental right and violates both due process and equal protection. (See, e.g., *Obergefell, supra,* 576 U.S. at p. 675 [state laws excluding same-sex couples from marriage violate both due process and equal protection]; *In re Humphrey* (2021) 11 Cal.5th 135, 150 ["Principles of equal protection and substantive due process . . . converge in the money bail context. The accused retains a fundamental constitutional right to liberty."]; *In re Gary W.* (1971) 5 Cal.3d 296, 307 (*Gary W.*) [lack of jury trial right in juvenile civil commitment proceedings violates both due process and equal protection].) Once it is established that a law infringes on a fundamental right, it is understandable that the law may be invalid both as a matter of due process (i.e., the law violates a freestanding right) and as a matter of equal protection

7

(i.e., the law lacks a compelling rationale for denying the right to some people while leaving others protected).

Importantly, however, these cases do not suggest that in determining whether a particular deprivation impinges on a fundamental interest and warrants heightened equal protection scrutiny, courts must first conclude as a matter of due process that the deprivation infringes an independent fundamental right. To the contrary, we have explained — notably, in a case about a law that treated SVPs less favorably than other civil committees — that "[d]ue process and equal protection protect different constitutional interests:   due process affords individuals a baseline of substantive and procedural rights, whereas equal protection safeguards against the arbitrary denial of benefits to a certain defined class of individuals, *even when the due process clause does not require that such benefits be offered.*"   (*People v. McKee* (2010)  47 Cal.4th 1172, 1207 (*McKee*), italics added.)   We have maintained a distinction between fundamental rights, which give rise to freestanding claims for constitutional protection, and fundamental interests, which warrant heightened protection to the extent they are selectively withheld.

## B.

The surest sign of confusion in today's opinion is its suggestion — citing *Washington v. Glucksberg* (1997) 521 U.S. 702, 720–721, *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 940, and *In re Marriage Cases*, *supra*, 43 Cal.4th 757, 824 — that "substantive due process" methodology may inform the equal protection inquiry before us.   (Maj. opn., *ante*, at p. 22.) *Glucksberg* and *Dawn D.* are key precedents on "analyzing substantive due process claims"; they discuss how courts are to

determine whether an asserted interest is a fundamental right under the due process clause. (*Dawn D.*, at p. 941; see *Glucksberg*, at pp. 720–721.) But those cases say nothing about how to assess whether an interest ranks as fundamental for equal protection purposes. Indeed, neither *Glucksberg* nor *Dawn D.* addressed any equal protection claim at all. Likewise, the cited passage of *In re Marriage Cases* discusses whether the right to marry is a fundamental liberty under the due process clause, not whether it is a fundamental interest for equal protection purposes. While due process and equal protection may offer "complementary" protections (maj. opn., *ante*, at p. 43), dicta in today's opinion appear to conflate the two, despite the hornbook rule that a fundamental interest need not itself be rooted in a due process liberty interest. (Compare *id.* at p. 44 ["If such a fundamental interest exists, it would flow from the fundamental liberty interest protected by procedural due process."] with Feldman & Sullivan, Constitutional Law, *supra*, § 5, p. 836 [fundamental interests "are not rooted in any independent source of protection elsewhere in the Constitution; if they were, there would be no need for litigants to resort to equal protection in order to protect them indirectly"].)

Instead of substantive due process cases, *Serrano I* and *Serrano II* are the pertinent authorities here. In *Serrano I*, we applied strict scrutiny to wealth-based disparities in public school financing because "the distinctive and priceless function of education in our society warrants, indeed compels, our treating it as a 'fundamental interest.' " (*Serrano I, supra*, 5 Cal.3d at pp. 608–609.) In reaching this conclusion, we did not hinge our analysis on whether education is an express or implied fundamental right. Rather, we observed that education is "crucial to participation in, and the functioning of, a democracy";

that education, like voting, is " 'preservative of other basic civil and political rights' "; that "the public schools of this state are the bright hope for entry of the poor and oppressed into the mainstream of American society"; that education has a universal and lasting impact on the development of American youth; and that the state makes public school attendance compulsory. (*Id.* at pp. 607–609, 610.)

In *Serrano II*, we affirmed our prior decision applying strict scrutiny and striking down wealth-based disparities in public school financing on equal protection grounds despite the high court's intervening decision in *Rodriguez* finding no express or implied fundamental right to education under the federal Constitution. (*Serrano II*, *supra*, 18 Cal.3d at p. 762; see *Rodriguez*, *supra*, 411 U.S. at p. 35.) *Rodriguez* held that rational basis review applies to equal protection claims challenging wealth-based disparities in public school financing. (*Rodriguez*, at p. 40.) But we declined to adopt the high court's rubric for assessing whether an interest is fundamental for purposes of equal protection. (*Serrano II*, at pp. 767–768.) We said we are not constrained "to gauge the importance of rights and interests affected by legislative classifications wholly through determining the extent to which they are 'explicitly or implicitly guaranteed' [citation] by the terms of our . . . state Constitution. In applying our state constitutional provisions guaranteeing equal protection of the laws we shall continue to apply strict and searching judicial scrutiny to legislative classifications which, because of their impact on those individual rights and liberties which lie at the core of our free

and representative form of government, are properly considered 'fundamental.' " (*Id.* at pp. 767–768, fns. omitted.)

*In re Marriage Cases* is also instructive. In evaluating the constitutionality of a statutory scheme that designated legal unions between heterosexual couples as "marriages" and legal unions between same-sex couples as "domestic partnerships," we conducted two separate analyses. The first was a fundamental rights analysis, which asked whether same-sex couples have a fundamental right to marriage. (*In re Marriage Cases*, *supra*, 43 Cal.4th at pp. 809–831.) We concluded that the California Constitution "guarantees same-sex couples the same substantive constitutional rights as opposite-sex couples to choose one's life partner and enter with that person into a committed, officially recognized, and protected family relationship that enjoys all of the constitutionally based incidents of marriage." (*Id.* at p. 829.)

But this conclusion did not answer whether the state could designate some unions as marriages and others as domestic partnerships, where the latter gave same-sex couples the same substantive rights as the former, just under a different name. (*In re Marriage Cases*, *supra*, 43 Cal.4th at p. 830.) In determining whether this difference violated equal protection, we saw no need to resolve whether the constitutional right to a legal union encompassed the right to have the union designated a "marriage." (*Ibid.*) We did not decide, for example, whether it would be constitutional for the state to change the official name of legal unions "for *all* couples." (*Ibid*.) Instead, we said "one of the core elements embodied in the state constitutional right to marry is the right of an individual and a couple to have their own official family relationship accorded respect and dignity equal to that accorded the family relationship of other couples."

11

(*Id.* at p. 844.) The assignment of a different name to same-sex unions "poses a risk" of denying gay couples this right of equal dignity. (*Ibid.*; see *id.* at p. 831 ["serious risk"]; *id.* at p. 846 ["very significant risk"].) This risk led us to conclude that the naming classification merited strict scrutiny under equal protection principles.

These venerable precedents do not state a rigid formula for assessing whether an interest ranks as fundamental for equal protection purposes. But they do indicate that the analysis differs from the *Glucksberg*/*Dawn D.* methodology for discerning substantive due process rights. In addition to considering the importance of an asserted interest to society and affected individuals, we have examined the "impact" of the asserted interest "on those individual rights and liberties which lie at the core of our free and representative form of government" (*Serrano II*, *supra*, 18 Cal.3d at pp. 767–768) and the "risk" that deprivation of the asserted interest would pose to the enjoyment of a fundamental right (*In re Marriage Cases*, *supra*, 43 Cal.4th at p. 844). Quite apart from whether the asserted interest is itself a fundamental right (it need not be), what matters is what we might call *proximity* to a fundamental right — that is, whether deprivation of the asserted interest appreciably burdens, negatively impacts, or risks eroding the effective exercise of a fundamental right. That is the relevant inquiry here.

## II.

Against this doctrinal backdrop, it is evident that much of today's opinion goes on an unnecessary tangent in laboring to prove that Cannon has no separate fundamental right to the personal advisement and waiver process he seeks. (Maj. opn.,

*ante*, at pp. 21–26.) This *due process* inquiry does not answer the *equal protection* question before us, and as the Attorney General notes in his briefing, "Cannon has never contended that the state or federal Due Process Clause provides independent constitutional support for the procedures that he seeks."

Nor does today's opinion frame the correct inquiry when it says "the legislatively selected procedures in the [Sexually Violent Predator Act], which make a jury trial available on demand, do not impose a significant burden on the fundamental liberty interest itself." (Maj. opn., *ante*, at p. 27.) The court says that "*Gary W.* concluded that in the case of involuntary commitment, it is the *liberty interest* that is fundamental . . . ." (*Id.* at p. 19.) But that is because the issue in *Gary W.* was whether potential California Youth Authority committees had a right to a jury trial *at all*; in that context, we held that in order to protect the fundamental liberty interest of civil commitment candidates, "a jury trial must be made available . . . as a matter of procedural due process when the statutory scheme fails to provide one." (Maj. opn., *ante*, at p. 12, citing *Gary W.*, *supra*, 5 Cal.3d at pp. 306–307.) Now that it is well established that potential committees have a fundamental right to a jury trial, it is not clear why the court thinks we should examine whether the lack of personal advisement and waiver in the Sexually Violent Predator Act's (SVPA; Welf. & Inst. Code, §§ 6600 et seq.) on-demand procedure burdens "the fundamental liberty interest itself" (maj. opn., *ante*, at p. 27) as opposed to whether it burdens the fundamental jury trial right "[m]*andate*[*d*]" by that liberty interest (*id.* at p. 17).

In *In re Marriage Cases*, we did not ask whether the different names assigned to legal unions of same-sex versus opposite-sex couples burdened the fundamental liberty interest

that undergirds the right to marry. Instead, we asked whether the difference in naming posed a risk to effective enjoyment of *the right to marry itself*, a core element of which is the right to have one's official family relationship be accorded the same respect and dignity as the family relationships of other couples. (*In re Marriage Cases*, *supra*, 43 Cal.4th at p. 844.) By the same logic, the pertinent inquiry here is not whether lack of personal advisement and waiver burdens an alleged SVP's fundamental liberty interest, but *whether lack of those procedures burdens the effective exercise of the fundamental right to a jury trial*.

This specificity is important because the inquiry, when properly focused this way, finds a ready answer in our precedents. In the criminal context, we have recognized that "a judgment . . . resulting from a court trial must be reversed if the defendant did not expressly waive the right to a trial by jury." (*People v. Ernst* (1994) 8 Cal.4th 441, 443.) That is because we consider the lack of express waiver to be equivalent to denial of the right itself: "without an express waiver by defendant of his right to have the case tried to a jury," a bench trial "denie[s] defendant his right to a jury trial." (*Id.* at p. 448.) In *People v. Collins* (2001) 26 Cal.4th 297, the trial court assured the defendant that he would receive a benefit by waiving his right to a jury trial. We said the trial court's action "rendered that waiver involuntary" and explained that "[l]ike a trial court's denial of the right to jury trial by an outright refusal to provide such a trial, . . . improperly inducing a waiver of that right amounts to a 'structural defect in the proceedings' " requiring reversal. (*Id.* at p. 312.)

We applied *Ernst*'s and *Collins*'s understandings of the impact of waiver protections on the jury trial right to civil commitment proceedings in *People v. Blackburn* (2015)

61 Cal.4th 1113 (*Blackburn*) and *People v. Tran* (2015) 61 Cal.4th 1160 (*Tran*). In *Blackburn*, we considered whether a trial court must advise a civil committee of the right to a jury trial and whether the trial court must obtain a personal waiver of that right in proceedings for extending the involuntary commitment of mentally disordered offenders (MDOs) (now referred to as offenders with mental health disorders (OMHDs)). (Maj. opn., *ante*, at p. 2 & fn. 2.) Citing *Ernst* and *Collins*, we held that in civil commitment proceedings, "we treat a trial court's failure to obtain a required personal jury trial waiver as tantamount to the denial of a jury trial, and as such, it constitutes a 'miscarriage of justice' under California Constitution, article VI, section 13." (*Blackburn*, at p. 1134.) We reiterated this holding in *Tran*, explaining that an "acceptance of an invalid jury trial waiver . . . result[s] in a complete denial of the defendant's right to a jury trial" in civil commitment hearings for persons originally committed after pleading guilty by reason of insanity (NGIs). (*Tran*, at p. 1169.) *Blackburn* and *Tran* established that denial of an express waiver requirement in OMHD and NGI commitment proceedings is tantamount to denial of a jury trial right and constitutes structural error requiring automatic reversal.

Contrary to what the court suggests (maj. opn., *ante*, at pp. 33–39), the holdings in *Blackburn* and *Tran* were not a function of the limitations of the records in those cases. We applied *Blackburn*'s holding — i.e., that the absence of personal advisement and waiver is structural error — to the procedures in Tran's fourth NGI extension hearing despite evidence that Tran might have known he had a jury trial right given his experiences at three prior hearings. (*Tran, supra*, 61 Cal.4th at pp. 1173–1174 (conc. & dis. opn. of Cantil-Sakauye, C.J.).) More

generally, *Blackburn*'s caveat that there may be circumstances "where the record shows the defendant lacked the capacity to make a proper waiver, or in fact made such a waiver even without the . . . advisement" (maj. opn., *ante,* at p. 36) was simply an acknowledgment of the "limited" scenarios in which lack of personal advisement and waiver might not be prejudicial. (*Blackburn, supra,* 61 Cal.4th at p. 1136.) The overall thesis that the lack of such procedures *is* prejudicial — i.e., that it is tantamount to denial of the jury trial right — is undeniably the core rationale for the holdings in *Blackburn* and *Tran.* That the jury trial right was provided by statute in those cases (maj. opn., *ante*, at pp. 46–47) does not alter the force of this reasoning here. The basic rationale of *Blackburn* and *Tran* directly supports the conclusion that SVP candidates have a fundamental interest in such procedures and that legislative classifications providing the procedures to OMHD and NGI candidates while denying them to SVP candidates warrant heightened equal protection scrutiny.

Today's opinion extensively discusses *People v. Barrett* (2012) 54 Cal.4th 1081 (*Barrett*) and says *Barrett* determined that personal advisement and waiver requirements in civil commitment proceedings are not "fundamental rights" and their absence does not "unduly burden[] fundamental interests." (Maj. opn., *ante,* at p. 33.) But *Barrett* conducted no fundamental interest analysis at all. Instead, the court held that the equal protection claim at issue failed at the "threshold" step of establishing that "dangerous mentally retarded persons and dangerous mentally disordered persons are similarly situated . . . as to the ancillary purpose that an express jury trial advisement, and an express personal waiver, purportedly serve." (*Barrett,* at pp. 1107–1108.) The court reasoned that in

16

light of their differing "mental conditions," "the two groups are not similarly situated as to . . . comprehending and controlling the decision whether to request a jury trial.  Thus, any disparate statutory treatment with respect to jury trial advisements does not deprive persons like Barrett of equal protection of the law." (*Id.* at p. 1109; see *Blackburn*, *supra*, 61 Cal.4th at pp. 1128–1129 [discussing *Barrett*'s reasoning].)  *Barrett* went no further.

The court defends its reading of *Barrett* by observing that " ' "[t]o ask whether two groups are similarly situated in this context" . . . is essentially "the same as asking whether the distinction between them can be justified under the appropriate test of equal protection." ' "  (Maj. opn., *ante*, at p. 33, citing *People v. Hardin* (2024) 15 Cal.5th 834, 849 (*Hardin*).)  But this is true whether the "appropriate test of equal protection" is rational basis review or heightened scrutiny.  The court in *Barrett* may have believed that the differences between persons with intellectual disabilities and persons with mental illness in terms of their "mental conditions" (*Barrett*, *supra*, 54 Cal.4th at p. 1109) are sufficient to justify disparate treatment with regard to personal advisement and waiver (1) only under rational basis review or (2) even under heightened scrutiny.  We simply do not know.

In that respect, *Barrett*'s reliance on the threshold "similarly situated" analysis illustrates the concerns that recently led us to jettison that approach:  "[O]ne can only reach the conclusion that two groups are similarly situated with respect to the purposes of a particular law after considering the law's aims and how the differential treatment relates to those aims.  But the first, 'similarly situated' step of the analysis provides substantially less guidance about how this inquiry is to proceed:  '*How* similarly situated, precisely, relative to *which*

17

aims? These are questions courts already explore at the justification step, using the tiers of scrutiny to guide their answers.' [Citation.] In the context of challenges like this one, the similarly situated test serves no real purpose. At best it duplicates the justification inquiry prescribed at the second step of the analysis; at worst it creates an unnecessary threshold obstacle to the adjudication of potentially meritorious constitutional challenges; and in all events it injects unnecessary uncertainty into the analysis, particularly in the situations in which the challenged law reflects multiple, sometimes competing aims." (*Hardin*, *supra*, 15 Cal.5th at p. 849.) If anything, these concerns underscore the infeasibility of drawing any inference from *Barrett* as to the applicable standard of equal protection review. In short, *Barrett* said nothing about whether potential committees have a fundamental interest in personal advisement and waiver.

Apart from its misplaced reliance on *Barrett*, today's opinion provides virtually no analysis of whether the absence of personal advisement and waiver in this context has an appreciable impact on the fundamental right to a jury trial. The court says that although personal advisement and waiver are part of some civil commitment statutes, they "ha[ve] not been uniformly adopted across all of them" (maj. opn., *ante*, at p. 25) and that "the Legislature chose to protect an alleged SVP's right to make an informed choice of factfinder *through* the statutory right to and advice of counsel" (*id.* at p. 38). But the fact that the Legislature has made these choices does not supply a constitutional justification for them, nor does it illuminate the

standard of review. It simply restates the equal protection question before us.

To be sure, "the SVPA honors th[e] traditional allocation of responsibility between attorney and client" (maj. opn., *ante*, at p. 25), and the Legislature evidently believed the presence of counsel would be sufficient to ensure a potential committee's effective exercise of the jury trial right. But the fact that "the Legislature chose a *different* set of procedures in the SVPA" than in the OMHD and NGI statutes (maj. opn., *ante*, at p. 38) frames the question — it does not provide any analysis — of whether the lack of personal advisement and waiver burdens the fundamental right to a jury trial. As to that question, we held in *Blackburn* that lack of personal advisement and waiver, even when the defendant has counsel, is tantamount to denial of the jury trial right, apart from certain "limited" circumstances. (*Blackburn, supra*, 61 Cal.4th at p. 1136; see *id.* at p. 1130.) It is difficult to see how *Blackburn*'s reasoning does not compel the conclusion that SVP candidates, no less than OMHD and NGI candidates, have a fundamental interest in such procedures and that the disparate treatment merits heightened review.

### III.

Up to this point, I have said "heightened scrutiny" or "heightened review," not strict scrutiny, applies to Cannon's equal protection claim. Because intermediate scrutiny is not an available standard of review in our doctrine, we are left with "the 'rigidity of [a] two-tier[ed] framework' that 'applies either a standard that is virtually always met [rational basis] or one that is almost never satisfied [strict scrutiny].' " (*Hardin, supra*, 15 Cal.5th at p. 868 (dis. opn. of Liu, J.).) As explained above, I do not think it is correct to apply "the sort of lax analysis that

has become typical ' "[i]n areas of social and economic policy" ' " (*id.* at p. 867) to important protections in a civil commitment proceeding. But I am not convinced that the legislative classification here warrants the most exacting scrutiny either. The procedures required in civil commitment proceedings "are flexible [citation], and the quantum and quality of the process due depend upon the nature and purpose of the challenged commitment." (*Barrett*, *supra*, 54 Cal.4th at p. 1099.) Because it is the Legislature's prerogative to craft procedures that are sensitive to "the special character of the commitment proceeding at issue" (*id.* at p. 1100), I do not think it is correct to apply a standard of review that would presumptively invalidate all such distinctions.

I would instead apply the instruction in *McKee* that on remand "[t]he trial court must determine whether the legislative distinctions in classes of persons subject to civil commitment are reasonable and factually based — not whether they are incontrovertible or uncontroversial." (*McKee*, *supra*, 47 Cal.4th at pp. 1210–1211.) To uphold the disparate treatment at issue, the trial court must be satisfied that it is "based on a reasonable perception" of "unique" features of SVP candidates or SVP proceedings compared to OMHD and NGI candidates or proceedings, "rather than a special stigma that SVP's may bear in the eyes of California's electorate" or the Legislature. (*McKee*, at p. 1210.) This is neither a reflexively deferential standard nor is it an impossible standard to meet. In my view, this approach is properly responsive to the core of the equal protection concern while respecting the Legislature's prerogative to make reasonable policy choices.

In the future, the civil commitment context may prove to be an appropriate area for our courts to transcend the rigid

rational basis/strict scrutiny binary and adopt an approach with "nuance and sensitivity" to account for the competing interests at stake in each case. (*Hardin, supra,* 15 Cal.5th at p. 868 (dis. opn. of Liu, J.); see *People v. Nolasco* (2021) 67 Cal.App.5th 209, 224–225 ["*McKee* seems to have applied what purported to be a form of 'heightened scrutiny' that appears to be less rigorous than strict scrutiny but more onerous than rational basis scrutiny."].)

**LIU, J.**

PEOPLE v. CANNON

S277995


Dissenting Opinion by Justice Evans


I dissent for the reasons stated in parts I and II of Justice Liu's dissenting opinion.

**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Cannon

_____

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 85 Cal.App.5th 786
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S277995
**Date Filed:** August 18, 2025

_____

**Court:**  Superior
**County:**  Mendocino
**Judge:**  Ann C. Moorman

_____

**Counsel:**

Jeremy Price, under appointment by the Supreme Court, and Rachel Belden, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Michael J. Mongan, State Solicitor General, Lance E. Winters, Chief Assistant Attorney General, Janill L. Richards, Principal Deputy State Solicitor General, Mica Moore and Aaron D. Pennekamp, Deputy State Solicitors General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeremy Price
Attorney at Law
2991 Sacramento Street, Unit #216
Berkeley, CA 94702
(510) 619-0120

Aaron D. Pennekamp
Deputy State Solicitor General
1300 I Street
Sacramento, CA 95814
(916) 210-6661